**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| | **MEMORANDUM OPINION AND ORDER** |
| Doe YZ, | |
| Plaintiff, | |
| v. | Civil No. 15-1151 ADM/SER |
| Shattuck-St. Mary's School, | |
| Defendant. | |
| Doe XY, | |
| Plaintiff, | |
| v. | Civil No. 15-1154 ADM/SER |
| Shattuck-St. Mary's School, | |
| Defendant. | |
| Doe AB, | |
| Plaintiff, | |
| v. | Civil No. 15-1155 ADM/SER |
| Shattuck-St. Mary's School, | |
| Defendant. | |

_____

Jeffrey R. Anderson, Esq., Jeff Anderson & Associates, P.A., Saint Paul, MN, on behalf of Plaintiffs.

Stephen O. Plunkett, Esq., and Steven P. Aggergaard, Esq., Bassford Remele, P.A., Minneapolis, MN, on behalf of Defendant.

_____

# I.  INTRODUCTION

On July 18, 2016, the undersigned United States District Judge heard oral argument on Defendant Shattuck-St. Mary's School's ("Shattuck") Motion for Summary Judgment [Docket No. 57][1] and Motion to Exclude Expert Testimony of Charol Shakeshaft [Docket No. 58] in the three above-captioned cases.  Also before the Court is Plaintiffs[2] Doe YZ, Doe XY, and Doe AB's (collectively, "Plaintiffs") Objection [Docket No. 82] to Magistrate Judge Steven E. Rau's June 13, 2016 Order [Docket No. 69] denying Plaintiffs' Motion to Amend Their Complaints to Add a Claim for Punitive Damages [Docket No. 38].

These cases arise from alleged sexual abuse at Shattuck approximately fifteen years ago. Shattuck is a private boarding and day school located in Faribault, Minnesota.  Plaintiffs allege sexual abuse by former Shattuck teacher Lynn Seibel while they were students at the school. They seek to hold Shattuck liable for the abuse under theories of negligence, negligent supervision, and negligent retention.

For the reasons set forth below, Shattuck's Motion for Summary Judgment and its Motion to Exclude Shakeshaft's testimony is denied.  Plaintiffs' Objection to Judge Rau's Order is sustained in part and overruled in part.

---

[1] Docket citations are to the docket in Doe YZ v. Shattuck-St. Mary's School, No. 15-1151, unless otherwise specified.

[2] Plaintiffs are proceeding under pseudonyms because these cases arise out of alleged sexual abuse that occurred when they were minors.  See Order Regarding Pls.' Use Pseudonyms [Docket No. 36].

## II. BACKGROUND[3]

Shattuck is a private boarding and day school for students in grades 6–12.  Goffe Aff.

[Docket No. 74] Ex. 2 ("Student/Parent Handbook") at 14–15, 36.   Most Shattuck students live

on campus in residence halls supervised by "dorm parents."  Id. at 14–15, 55–56.  Dorm parents

are Shattuck teachers or coaches who live in the residence halls and serve as on-site parents for

the students.  Id. at 55–56; Goffe Aff. Ex. 5 ("Hedderick Dep. I") at 70:1–1.

Plaintiffs are three male former Shattuck students.  Doe AB attended Shattuck from 1999

to 2001, when he was 17 and 18 years old.  Goffe Aff. Ex. 14 ("Doe AB Dep.") at 10:11–14,

91:19–23.  Doe XY attended Shattuck from 1998 to 2003, when he was 13 to 18 years old.

Goffe Aff. Ex. 15 ("Doe XY Dep. I") at 34:10–12, 51:11–13.  Doe YZ attended Shattuck from

2000 to 2004, when he was 14 to 18 years old.  Goffe Aff. Ex. 13 ("Doe YZ Dep.") at 113:1–4;

Aggergaard Decl. [Docket No. 64] Ex. 14 ("Crim. Compl.") at 17.  During their time at Shattuck,

each Plaintiff lived for a period of time in Whipple Hall ("Whipple"), where Lynn Seibel

("Seibel") was a dorm parent and, later, a study hall proctor.  Doe XY Dep. I at 184:2–4; Doe

AB Dep. 200:6–14; Doe YZ Dep. at 114:3–6, 116:6–20, 154:2–11.

### A.  Lynn Seibel

Seibel started working at Shattuck in 1992 as a drama teacher.  Goffe Aff. Exs. 7–8.  He

had extensive prior experience in theater and had taught acting classes, but he had not previously

worked in an educational institution.  Id. Ex. 9 ("Seibel Dep.") at 9:14–10:13.  Seibel completed

---

[3] A court considering a motion for summary judgment must view the facts in the light
most favorable to the nonmoving party and give that party the benefit of all reasonable
inferences to be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
U.S. 574, 587 (1986).

an application and interview as part of the application process at Shattuck.  Id. at 79:18–20.

Seibel could not recall what, if anything, Shattuck asked him about his criminal record, but he

testified that "I'm sure I didn't bring it up."  Id. at 79:21–81:3.  At the time of his application,

Seibel had two misdemeanor convictions in California, one of which was for lewd conduct.

Goffe Aff. Ex. 10.

Initially Seibel lived off campus, but he soon became a dorm parent and moved with his

wife and children into an apartment in Whipple.  Seibel Dep. at 11:14–24.  As a dorm parent,

Seibel served as both a supervisor and mentor to the students residing in Whipple.  Id. at

21:15–22, 55:12–23.  Seibel was well liked by the students.  Goffe Aff. Ex. 3 ("Kieffer Dep.") at

82:10–25; Hedderick Dep. I at 26:22–25.  He had a reputation "as somebody [the students could]

go to and talk to" about their problems.  Seibel Dep. at 21:15–22.  Seth Hedderick

("Hedderick"), who served as a dorm parent in Whipple with Seibel, recalled that there was a

general sense among the faculty that Seibel "was a bit more permissive in terms of what he

allowed in his classes and in the dorm."  Id.  For example, Seibel would allow students to leave

the dorm after curfew through his apartment, which had an exterior door.  Id. at 29:1–12.  Doe

YZ testified, when Seibel was in charge, "you could do whatever you really wanted to if he liked

you."  Doe YZ Dep. at 155:16–17.

Seibel was also viewed as a celebrity on campus.  Hedderick Dep. I at 27:3–9.  He sang

the national anthem and served as the announcer at Shattuck hockey games.  Id.; Seibel Dep. at

110:11–13.  He had roles in two movies that were filmed at Shattuck:  "Embrace the Vampire"

and "Mighty Ducks 3."  Hedderick Dep. I at 27:6–7; Seibel Dep. at 91:4–8, 92:19–25.  For

"Embrace the Vampire," Seibel served as the location manager and played a professor who gives

a lecture on erotic art.  Seibel Dep. at 89:19–21, 91:4–16.  In its final version, the film was

sexually explicit, though Seibel testified that neither he nor Headmaster Greg Kieffer knew that

when they approved the project.  Id. at 88:15–89:18, 92:5–8.

## B.  Seibel's Inappropriate Conduct with Students

A few years after he became a dorm parent, Seibel acted inappropriately around the

students living in Whipple.  He recounted stories of his sexual history.  Seibel Dep. at 171:5–9;

Doe YZ Dep. at 189:21–190:5; Crim. Compl. at 7.  He asked them about their sex lives.  Doe YZ

Dep. at 162:17–18.  And he encouraged activities involving nudity, such as streaking the girls'

dorms and naked dance parties.  Seibel Dep. at 57:7–11; Crim. Compl. at 9, 11–13.

During the naked dance parties, which occurred in Whipple's basement shower area,

students would  jump around, slap each other on the buttocks, and stretch their penises.  Doe YZ

Dep. at 139:17–140:7; Doe AB Dep. at 214:8–13; Aggergaard Decl. Ex. 21 ("Doe XY Dep. II")

at 195:5–7.  The students played loud music, and on at least one occasion there was a live band.

Seibel Dep. at 60:18–19; Doe AB Dep. at 210:23–211:9; Doe XY Dep. I at 187:3–7.  Seibel

would attend and watch the students during these parties.  Seibel Dep. 60:5–7; Doe YZ Dep. at

145:19–22; Doe AB Dep. at 141:20–142:9.

Seibel also frequently came into the upstairs bathrooms "to chat" while students were

showering.  Doe XY Dep. I at 198:15–200:24; Doe AB Dep. at 222:4–7; Crim. Compl. at 8–9,

12.  Doe YZ testified, Seibel would come into the bathroom and "he'd encourage us to gather in

there, four, five, six guys at a time.  And then he'd come walk around.  And on that one, in the

group shower on the east, there was no curtain."  Doe YZ Dep. at 150:4–10. During some of

these shower visits, Seibel advised the students to shave their pubic region and told them how

good it looked when they did so.  Doe YZ Dep. at 159:5–23; Doe AB Dep. at 223:2–8; Doe XY

Dep. I at 202:2–16.

Further inappropriate conduct by Seibel occurred during what was referred to as "AP

drama class."  Doe AB described how he became involved in this so-called class:

> Mr. Seibel told us it was something that had been done for many
> years prior to us.  He had a name for the class.  Told us he could
> make our penises bigger; he could teach us things.  And all we had
> to do was, you know, meet him in a room and not say anything
> about it.

Doe AB Dep. at 241:10–17.  In the room with Seibel, the students watched pornography and

masturbated while Seibel walked around the room, fully clothed, explaining how to perform

penis enlargement exercises.  Id. at 245:2–247:1; Seibel Dep. at 50:5–25; Crim. Compl. at 7–12.

He also measured the students' penises with a ruler during these sessions and talked about whose

penis was the largest.  Doe AB Dep. at 246:8–10; Seibel Dep. at 105:10–19; Crim. Compl. at

7–12.

Seibel concealed his motive of his own sexual gratification from the students.  Seibel

Dep. at 25:10–20.  He believed the students would stop participating in the activities if they

realized they were being abused, so he was careful not to show any sexual interest in the

students.  Id.  Instead, he portrayed himself as a "guru" the students could trust and learn from.

Id. at 17:17–25.  He "groomed" the students to "talk[ ] about their penises, about their sexuality .

. . so they would feel comfortable being naked in front of [him] and maybe even masturbating."

Id. at 100:10–25.  And he approached the "AP drama" sessions "very clinically" to make the

exercises and measurements appear legitimate.  Id. at 27:22–28:18.  These strategies worked, in

Seibel's view, because the students "could say to themselves, 'Well, he's not really doing this for

his sexual gratification, he's doing it for our own benefit.'"  Id. at 73:14–21.

## C.  Reports About Seibel's Inappropriate Conduct

Shattuck students and teachers raised concerns about Seibel's conduct as early as 1996.

Scott Ewing ("Ewing"), a student who lived in Whipple, told dorm parent Jay Long ("Long")

during the 1996–1997 school year that Seibel did not like him because he would not get naked in

front of Seibel as the hockey players did.  Ewing Decl. [Docket No. 77] ¶¶ 7–8, 16.  Long told

Ewing that he had a paranoia complex.  Id. ¶ 16.  The following school year, 1997–1998, Ewing

and a group of students told dorm parent Michael Cleary ("Cleary") that they felt singled out by

Seibel compared to the hockey players who were involved in streaking and who walked around

naked in the dorms.  Id. ¶¶ 18–19.  Cleary dismissed the group's concerns as insignificant.  Id. ¶

20.

During the 1999–2000 school year, a male student told dorm parent Max Prokopy

("Prokopy") that Seibel had approached the student about penis enlargement techniques that he

could pass along if the student wished.  Prokopy Aff. [Docket No. 76] ¶¶ 15, 24.  Prokopy had

previously heard students talk about naked dance parties and witnessed Seibel exit the shower

room laughing.  Id. ¶¶ 19, 21.  Prokopy concluded based on his casual style of speech, that the

student did not accept the offer and that it was not necessary to report the information to anyone.

Id. ¶ 25.  At that time, Prokopy had never been trained about, or even heard of, mandatory

reporting of suspected sexual misconduct.  Id. ¶¶ 11–12.

Sometime during the 1998–1999 or 1999–2000 school years, student "W3" reported to

his advisor, Charlene Krenzke ("Krenzke"), that Seibel held naked dance parties in the basement

of Whipple and patted students on their bare buttocks as they were leaving these parties.

Krenzke Aff. [Docket No. 75] ¶ 9.  Krenzke told W3 to report what he told her to the headmaster

or student counselor.  Id. ¶ 10.  Krenzke had not received training from Shattuck regarding

mandatory reporting or how to handle reports of sexual misconduct.  Id. ¶ 11.  She regrets she

did not relay W3's report to the headmaster.  Id. ¶ 12.

    Seibel has testified that William Scheel ("Scheel"), then the president of Shattuck's

board of trustees, confronted him about W3's report to Krenzke.  Seibel Dep. at 44:18–52:19;

Goffe Aff. Ex. 19 ("Scheel Dep.") at 13:19–14:14.  As Seibel remembers it, Scheel told Seibel

that W3 had heard about Seibel's AP drama classes and reported to Krenzke, who went to the

headmaster.  Seibel Dep. at 48:21–49:6.  Scheel asked Seibel "'Is it true, have you been having

these classes?' And [Seibel] said yes and [Scheel] said 'Well, you can't.  That's not appropriate,

you know that.'"  Id. at 45:8–11.  In response to Seibel's admission, Scheel said something to the

effect of "We trust you to stop it."  Id. at 50:3–4.

    In September or October 2000, dorm parent Hedderick witnessed and reported a naked

dance party that occurred under Seibel's watch.  Hedderick Dep. I at 15:24–16:1, 30:20–34:24.

Hedderick testified that he heard "rowdy screaming" coming from the Whipple basement one

night.  Id. at 31:8–10.  He went downstairs to investigate and discovered "a whole bunch of

naked boys" in the shower area playing music and jumping up and down.  Id. at 32:3–10.  When

he told the students they needed to go back to their rooms and put clothes on, they said, "It's

okay.  Seibs is down here.  Seibs says it's okay."  Id. at 32:14–19.  Hedderick then walked into

the bathroom and saw Seibel "standing in the corner of this bathroom with all these naked boys.

And he was fully clothed.  And he's just sort of standing there hanging out" and watching the

boys the way someone might watch people at a "fair."  Id. at 32:24–33:5.  Seibel explained the

scene to Hedderick as "The boys just need to blow off some steam."  Id. at 33:5–8.  The next

morning at breakfast, Hedderick told Headmaster Kieffer what he had seen the previous night.

Id. at 34:12–20.  Kieffer responded "I thought that had been stopped," which conveyed to

Hedderick that Kieffer had prior knowledge of Seibel's involvement in the naked dance parties.

Id. at 35:2–4; 86:21–25.  Hedderick further testified that he "complained about all of this to

anyone who would listen to [him] after that.  That, you know, how—how on earth could Lynn

Seibel still be a dorm parent."  Id. at 35:6–9.

Kieffer testified that he asked John Nelson ("Nelson"), the head of the upper school[4], and

Corby Smith ("Smith"), the dean of students, to investigate what Hedderick had reported to him.

Kieffer Dep. at 22:5–21.  Nelson and Smith later told Kieffer that they took care of it and that

"[i]t was not a problem, that it was kids . . . just blowing off steam and goofing off."  Id. at

22:23–23:1.  From then on, the basement shower area in Whipple was kept locked.  Aggergaard

Decl. Ex. 17 ("Hedderick Dep. II") at 37:24–38:10.  During his deposition, Kieffer initially

could not recall whether he or anyone else from the Shattuck administration confronted Seibel

about his presence at the naked dance parties, but when shown a statement he gave to police he

acknowledged that someone talked to Seibel about the naked dance parties around October 2000.

Id. at 23:2–6, 89:1–25.  Seibel testified Kieffer confronted him on two occasions about students

being naked under his supervision:  once about the naked dance parties and once about streaking.

Seibel Dep. at 57:7–58:23.

Seibel relates that other dorm parents or teachers walked in on the naked dance parties

---

[4] Shattuck has an upper school for students in grades 9–12 and middle school for students
in grades 6–8.

over the years.  Id. at 68:6–9.  He specifically recalled that dorm parents Johnny Walker and Len

Jones knew about the parties and expressed their disapproval to Seibel.  Id. at 61:10–62:2,

69:8–14.  Seibel testified that "everyone knew" about the naked dance parties because "there

was so much noise from [the students] yelling and shouting and . . . singing and dancing."  Id. at

59:25, 60:13–18.

**D.  W3's May 2001 Report About Seibel**

In late May 2001, W3 returned to the Shattuck campus after his graduation the previous

year.  Goffe Aff. Ex. 25 ("Gilbert Dep.") at 23:10–24:13.  During his visit, W3 told Molly

Gilbert ("Gilbert"), who worked in the Shattuck admissions office, about abusive behaviors he

observed during his time at Shattuck.  Id.  As Gilbert recorded in a June 5, 2001 memorandum,

W3 made two specific allegations.  Aggergaard Decl. Ex. 4 ("Gilbert Mem.").  First, W3 alleged

that there was rampant drug and alcohol abuse in the dorms, and that when he tried to report

instances of such abuse he was told by certain faculty, including Seibel, to "cover up" for the

students involved.  Id.  Second, W3 alleged that Seibel taught a special AP class on penis

enlargement for some of the boys residing in Whipple.  Id.  He claimed that he witnessed these

classes firsthand on several occasions in different locations ranging from Seibel's office to

individual dorm rooms.  Id.  He said that, during these classes, Seibel exposed his own penis to

demonstrate and sexually touched at least three students, including Doe AB.  Id.  He also

asserted that the students involved were able to "run riot" in the dorms because they threatened

to "go legal" against Seibel unless he allowed them to do whatever they wanted.  Id.

Gilbert took W3's allegations seriously.  She testified, "It was obvious he was nervous

and scared, understandably so, to bring this up.  It was a very sensitive issue, but I trusted what I

heard from him. He's a good kid." Gilbert Dep. at 32:17–21. In her memorandum, she also noted that W3 had tried to report this information earlier but either "couldn't go through with it" or "the right questions weren't being asked." Gilbert Mem. The day after her conversation with W3, Gilbert shared this information with Sonja Johnson ("Johnson"), Shattuck's director of alumni affairs. Id. Although they agreed that they had a legal obligation to report these allegations to the proper authorities at the school, Gilbert and Johnson did not know specifically what to do. Id. They consulted the school nurse, who referred them to Anne Jones ("Jones"), a psychologist on campus. Id.

After hearing about W3's report from Gilbert and Johnson, Jones immediately contacted Lynn Redmond ("Redmond"), the director of student services, and arranged a meeting with Headmaster Kieffer. Goffe Aff. Ex. 11 ("Jones Dep.") at 28:21–29:6. Jones also contacted the local police but was told that, due to a recent change in law, the police were not responsible for investigating reports of abuse at private schools; rather, private schools were required to investigate such reports themselves. Id. at 29:10–18. Jones, Redmond, and Kieffer met to discuss W3's report on June 7, and, in a memorandum summarizing the meeting, Jones recommended that Shattuck retain legal counsel. Goffe Aff. Ex. 23 ("Jones Mem."). She noted in the memorandum that there were "numerous questions and details yet to be clarified," including "the indication that a School staff member, Dallas Musselman, had been told of this situation during the 1999–2000 school year." Id.

**E. Investigation of W3's May 2001 Report**

As Kieffer testified, at that point "the red flags were flying" that Seibel might have a sexual interest in children. Kieffer Dep. at 54:17–21. Kieffer retained attorneys Doug

Christensen ("Christensen") and Holly Eng ("Eng"), then of Dorsey & Whitney LLP ("Dorsey"), as counsel to Shattuck.  Id. at 31:20–25, 33:1–5.  Christensen and Eng contacted the local police but discovered, as Jones had, that the police were not planning to investigate.  Goffe Aff. Ex. 18 ("Christensen Dep.") at 50:8–51:9.  Dorsey opened its own investigation into the conduct W3 reported to Gilbert.  Id. at 52:9–13; Kieffer Dep. at 41:11–16.

Christensen and Eng interviewed Kieffer about Seibel and W3.  Kieffer told them that Seibel was lax in his enforcement of some school rules, that he allowed students to streak, and that there were rumors about naked dance parties in Seibel's dorm.  Goffe Aff. Ex. 26 ("Eng Dep.") at 17:5–22; Christensen Dep. at 90:13–91:6.  Kieffer stated W3 was a student leader during his senior year and, in that capacity, met with Kieffer every week.  Christensen Dep. at 95:3–5.  Kieffer also disclosed that after W3 attended a drama club trip to New York City during which some students snuck out and partied, W3 told Kieffer in confidence that he "felt Seibel had not been vigilant enough" and that "Seibel looked the other way at times in the dorm."  Id. at 95:13–19.

The Dorsey attorneys also interviewed the Shattuck officials who brought W3's report to Kieffer's attention, including Gilbert.  Gilbert recalls feeling "nailed to a wall" during her meeting with the attorneys.  Gilbert Dep. at 39:5–7.  She testified:

> The questions I was asked were do you realize that these allegations could ruin this man's life, meaning Lynn Seibel.  He is married with children.  Are you sure—how can you be sure W3 isn't making this up.  I'm sure these are fairly standard questions, but it was very intimidating.  There was a how dare you element to this that I knew was wrong.  And I repeatedly had to say I'm just bringing this forward because I know I have to do that.  That is what I'm supposed to do. . . .  And they just kept telling me that I was about to ruin lives.

Id. at 40:2–15.

Christensen and Kieffer contacted W3 multiple times, but he declined to participate in the investigation.  Christensen Dep. at 71:14–17; Kieffer Dep. at 41:23–42:18.  According to Kieffer, W3 responded "if you keep harassing me, I'm going to take legal action."[5]  Kieffer Dep. at 42:12–14.

The attorneys then sought to interview the individuals named in W3's report.  They met with Dallas Musselman, but she denied receiving any reports about Seibel from W3 and said that the allegations could not be true.  Eng Dep. at 52:13–24; Kieffer Dep. at 56:5–12.  Because Kieffer thought that the three students W3 identified as having been sexually touched by Seibel would be more comfortable talking to someone they knew, rather than the Dorsey attorneys, Kieffer decided to conduct the interviews himself.  Eng Dep. at 61:2–6, 61:21–24.  However, Kieffer's employment at Shattuck ended shortly thereafter, at the end of June 2001.  Kieffer Dep. at 55:3–11.  Nothing further happened with the investigation until late August 2001, when it came to Eng's attention that the student interviews had not occurred.  Eng Dep. at 62:6–25.

Scheel, the president of Shattuck's board of trustees, was selected to interview the students after Kieffer's departure.  Scheel Dep. at 34:6–16.  He contacted the students by

---

[5] There is no testimony in the record from W3, so his reason for not cooperating with Shattuck's investigation of Seibel is unknown.  However, when he was interviewed in 2012 as part of the criminal investigation of Seibel, W3 told the detectives that "he was nervous to speak with [the Dorsey attorneys], because he does not know if he was under any type of confidentiality agreement with an attorney's office, who represents Shattuck-St. Mary's School." Goffe Aff. Ex. 29 ("Recorded Interview of W3").  W3 also told detectives that following his May 2001 report about Seibel, Kieffer and Christensen asked him to come to Minnesota "to do a deposition."  Id.  In a sworn statement, the detective who interviewed W3 said that W3 was unnerved by the calls from Christensen and Kieffer.  Goffe Aff. Ex. 16 ("Mueller Statement") at 29:4–20.

telephone during September 2001 and asked them five questions drafted by Christensen and Eng.

Id. at 36:11–19, 40:3–15; Goffe Aff. Ex. 27.  According to Scheel's memorandum of the

interviews, the questions and answers were as follows:

> 1. Did you witness any conduct on the part of Mr. Seibel that you believe was inappropriate?
>
> "Yeah, Mr. Seibel is a bit personal with kids."
> "Not really.  He would talk to the guys about making your dicks bigger."
> "No."
>
> 2. Did you ever hear of a "Special A.P. Course" "taught" by Mr. Seibel that involved instructing young men how to make their penises larger?
>
> "Yeah, I didn't go to it.  There were actually some meetings of the 'class' where kids went.  They were told about masturbating techniques."
> "Yes, he did talk about it.  He is definitely a strange guy.  I always thought he was weird.  I heard about it [the class] from my first year on."
> "I heard about it—I just heard guys talk about it."
>
> 3.  Did Mr. Seibel ever expose himself to you?
>
> "No, he never exposed himself."
> "No, he did not—he just talked about it."
> "No."
>
> 4.  Did Mr. Seibel ever touch you inappropriately? Specifically, did he ever touch your penis?
>
> "Not me.  You need to talk to [Roe 4]. [I did.] He (Mr. Seibel) had dreams about [Roe 4] and told him so.  He knew I wouldn't go for it.  His interest in this kind of stuff was definitely known around the dorm.  He encouraged the streaks—not only inside, but outside the dorm as well.  When they happened, he just laughed."
> "Not that I know of.  He just talked about it.  Everybody talked about the fact that he liked to look at guys in the shower.  He would pull the shower curtain back and just look.  Boys would say,

14

> 'Mr. Seibel's on the prowl.'"
> "A pat on the back is all."
>
> 5. Is there anyone else I should interview?
>
> [Roe 5]
> [Roe 6]

Goffe Aff. Ex. 30 ("Scheel Mem."). Scheel testified he drew two conclusions from these interviews. Scheel Dep. at 47:4–9. His private conclusion was that something happened with Seibel but he could not get the students involved to say so. Id. at 47:13–16, 47:19–23. His public conclusion shared with others was that the interviews were inconclusive. Id. at 47:16–18.

On October 9, 2001, Christensen and Eng met with Scheel and interim headmaster Dennis Brown ("Brown") to discuss the investigation. Goffe Aff. Ex. 28 ("Eng Mem."). They concluded that, although the investigation raised some troubling issues, it "did not uncover corroborating evidence that would justify written discipline, let alone discharge." Id. These four individuals then confronted Seibel with W3's allegations. Id. Seibel denied having any sexual contact with or encouraging nudity among the students, but he admitted that he answered questions students had posed about how to enlarge their penises. Id. When told that the allegations came from W3, Seibel responded that W3 was known as the dorm snitch, was prone to telling stories, and had a history of mental illness. Id. Seibel further said W3 was conflicted about his own sexuality and that his report may stem from a fantasy. Id. Brown warned Seibel that conversations about penis enlargement were inappropriate and cautioned him to avoid engaging in any activities that could be misperceived. Id. After the meeting, Eng left a voice

message with the local police summarizing the investigation.[6] Id.  The investigation was then closed.  Id.

Several months before the end of the 2000–2001 school year, Seibel had ceased being a dorm parent and had moved out of Whipple.  Seibel Dep. at 64:3–65:15.  The record contains conflicting evidence whether his leaving Whipple was related to W3's report.  Eng's email to Christensen on August 20, 2001 updating him on the status of the investigation reports "[t]he teacher is into his own house.  That process has been completed."  Goffe Aff. Ex. 40.  During the October 9, 2001 meeting, Seibel attributed his decision to move out of the dorm to the students' questions about penis enlargement.  Eng Mem.  In 2012, Seibel told police investigators that Brown made him move out of Whipple.  Seibel Dep. at 115:15–18.  During his deposition, however, Seibel testified that he requested to move out of Whipple and that it had nothing to do with W3's report.  Id. at 64:9–65:15, 115:21–116:18.  There is consistency in the record that Seibel moved to a house on campus before the end of the school year but continued to work at Whipple as a study hall proctor.  Doe YZ Dep. at 116:6–20, 154:2–11.

Sometime after the October 9, 2001 confrontation about W3's report, Brown expressed his concerns to Seibel about the AP drama class.  Seibel Dep. at 70:6–23.  As Seibel recalls, Brown told him that he had a problem and should get help.  Id. at 70:21–23.  Seibel thought that

---

[6] Although Eng wrote in her memorandum and testified at her deposition that she left a voice message with Dan Collins ("Collins") of the Faribault Police Department, Collins told investigators in 2012 that he did not remember receiving any communications from Dorsey attorneys or any complaints of sexual misconduct at Shattuck during the relevant time frame. Goffe Aff. Ex. 39.  In 2012, investigators reviewed local law enforcement and child protection agency records and found no documentary evidence that Shattuck or Dorsey ever made a report about Seibel.  Mueller Statement at 33:12–36:20.

Brown was concerned about the legal implications of Seibel's conduct and that Seibel's time at Shattuck might be coming to an end.  Id. at 70:23–71:5, 75:7–9.

## F.  Seibel's Resignation

In May 2003, pornography was discovered on Seibel's work computer while it was undergoing repair.  Goffe Aff. Ex. 4 ("Brown Dep.") at 35:4–8.  Brown confronted Seibel, who claimed that students must have gained access to his computer and downloaded the pornography.  Id. at 35:15–22.  Brown then retained Christensen to conduct an investigation.  Id. at 38:2–17.

Seibel's computer hard drive was examined by a forensic firm and found to contain hundreds of pornography-related files, a significant portion of which appeared to be illegal child pornography.  Goffe Aff. Ex. 33.  Upon reviewing the forensic firm's report and a sample of the images found on the hard drive, Nicholas Stoneman, the headmaster who replaced Brown as of July 2003, wrote to Christensen that "[i]t is fairly clear to me that there are several child porn/pose shots" and asked whether Shattuck was required to make a report to the authorities.  Goffe Aff. Ex. 35.  Christensen opined that no report was required, and Shattuck decided not to make a report.  Christensen Dep. at 199:6–19; Goffe Aff. Ex. 32 ("Stoneman Dep.") at 54:9–20.

Shattuck then negotiated a confidential separation agreement with Seibel, who had retained counsel.  Christensen Dep. at 195:6–12; Seibel Dep. at 147:22–150:14; Goffe Aff. Ex. 38.  Pursuant to the separation agreement, Seibel received a $12,500 severance payment and on August 7, 2003, Seibel tendered a resignation letter that stated he was leaving his teaching position at Shattuck to resume his acting career.  Seibel Dep. at 148:11–15; Goffe Aff. Ex. 37.

## G.  Criminal Investigation and Prosecution

In June 2012, the Faribault Police Department received a report of criminal sexual

conduct that occurred at Shattuck in 2001.  Crim. Compl. at 7.  The report came from a corrections officer who was conducting a pre-sentence investigation of a former Shattuck student.  Id.  Investigators interviewed that former student and several others, all of whom recalled Seibel's inappropriate sexual conduct.  Id. at 7–13, 15–18.

Seibel was interviewed and arrested in Los Angeles on August 13, 2012.  Id. at 13–15. He admitted to almost all of the allegations of the former students.  Id.  He was charged with multiple counts of criminal sexual conduct in Minnesota on October 8, 2012 and pled guilty on July 12, 2013.  Id. at 1–6, 19–20; Aggergaard Decl. Ex. 15 ("Guilty Plea").

## H.  Plaintiffs' Allegations

Following Seibel's prosecution, Plaintiffs commenced the present lawsuits against Shattuck.  The legal claims in each case are the same—negligence, negligent supervision, and negligent retention—but each Plaintiff's interactions with Seibel differ.

Plaintiff Doe AB was a Shattuck student for his 1999–2000 and 2000–2001 school years. Doe AB Dep. at 10:11–14, 91:19–23.  With Seibel's encouragement, Doe AB streaked the girls' dorms and attended a naked dance party featuring a live band.  Id. at 197:2–23, 209:19–21, 210:23–25, 213:2–8.  Seibel repeatedly came into the bathroom while Doe AB was showering and complimented his physique and genitals, telling him he had "a body to go into porn."  Id. at 222:21–223:8, 225:13–226:11.  Beginning in early 2000, Doe AB participated in the AP drama sessions.  Id. at 233:3–6, 242:4–8.  During one of those sessions, Seibel briefly touched Doe AB's penis.  Id. at 248:21–249:1.  Seibel was charged with two counts of criminal sexual conduct for his sexual abuse of Doe AB, who is Victim #4 in the Criminal Complaint, and pled guilty to one of those counts.  Crim. Compl. at 3–4; Guilty Plea at 3.

18

Plaintiff Doe XY attended Shattuck from 1998 to 2003.  Doe XY Dep. I at 17:15–20, 34:10–12.  During the 2000–2001 school year, Doe XY lived in Whipple and attended several naked dance parties when Seibel was present.  Id. at 184:2–10, 189:12–190:4.  Seibel also entered the bathroom while Doe XY was showering and, on at least one occasion, commented on Doe XY's pubic area.  Id. at 198:20–23, 202:2–13.  Doe XY heard about Seibel's penis enlargement exercises, and one night when Seibel came by his room for a lights-out check he asked Seibel whether he was performing them correctly.  Id. at 208:10–209:2.  Seibel responded by asking Doe XY to show how he was manipulating his penis, and told him where to apply pressure.[7]  Id. at 209:3–17.  Doe XY was not identified as a victim in the Criminal Complaint; he contacted law enforcement two days after Seibel was charged.  Goffe Aff. Ex. 12.

Plaintiff Doe YZ attended Shattuck from 2000 to 2004.  Doe YZ Dep. at 113:1–4.  He lived in Whipple during the 2001–2002 and 2002–2003 school years.  Id. at 114:3–6, 120:1–4.  Seibel had moved out of Whipple but continued to be there as a study hall proctor.  Id. at 116:11–20, 154:2–11.  When Seibel was in the dorm, he would go into the bathrooms and watch as Doe YZ and other students showered or held naked dance parties.  Id. at 141:20–142:9, 150:4–153:17.  During Doe YZ's junior year, 2002–2003, Seibel came into Doe YZ's room, asked him to take off his shirt, and said he should be an underwear model.  Id. at 159:24–161:2.  On another occasion, Seibel had Doe YZ view pornography and masturbate in front of him ostensibly to teach Doe YZ how to make an erection last longer.  Id. at 164:10–167:8.  Doe YZ

---

[7] This "lights-out incident" is discussed more fully in the June 1, 2016 Memorandum Opinion and Order [No. 15-1154 Docket No. 73]; Doe XY v. Shattuck-St. Mary's School, No. 15-1154, 2016 WL 3093389 (D. Minn. June 1, 2016).

also participated in several group masturbation sessions similar to what other students have

called AP drama class.  Id. at 169:10–172:10.  Seibel touched Doe YZ's penis during two such

sessions:  once when Seibel measured Doe YZ's penis with a ruler and once when Seibel traced

Doe YZ's penis on a sheet of paper.  Id. at 172:3–21, 191:7–13.  Seibel was charged with three

counts of criminal sexual conduct for his sexual abuse of Doe YZ, Victim #6 in the Criminal

Complaint, and pled guilty to one of those counts.  Crim. Compl. at 5; Guilty Plea at 3.

### III.  DISCUSSION

**A.  Motion to Exclude Shakeshaft's Testimony**

One of Shattuck's arguments in support of summary judgment is that Plaintiffs lack an

admissible expert opinion that Seibel's acts were foreseeable.  Accordingly, Shattuck's motion to

exclude Charol Shakeshaft's ("Shakeshaft") expert testimony will be addressed before

Shattuck's motion for summary judgment.

**1.  Legal Standard**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.

In short, the rule states a qualified witness may offer opinions or other testimony based on

scientific, technical, or specialized knowledge.  The testimony must be based on sufficient facts

or data, be the product of reliable principles and methods, and reflect a reliable application of

those methods to the facts of the case.  Fed. R. Evid. 702.  Rule 702 reflects the holding of

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and the cases interpreting Daubert,

including Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).  Fed. R. Evid. 702 advisory

committee's note.

Under Daubert, trial courts act as "gatekeepers" to ensure:  the proposed expert testimony

is useful to the factfinder in deciding the ultimate fact issue; the expert witness is qualified; and the proposed testimony is "reliable or trustworthy in an evidentiary sense."  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  In addition to Rule 702, trial courts may consider several factors set out by Daubert for determining reliability, including:  (1) whether the theory can be (and has been) tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory enjoys general acceptance in the relevant scientific community.  Daubert, 509 U.S. at 593-94.

No single factor is determinative.  Instead, the trial court must evaluate reliability in a flexible manner, as the Daubert factors may not necessarily apply "to all experts or in every case."  Kumho, 526 U.S. at 141.  Thus, the trial court has broad discretion not only in ultimately determining reliability, but also in how it determines reliability.  Id. at 142.  Finally, the trial court should generally resolve doubts about the usefulness of an expert's testimony in favor of admissibility.  Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 758 (8th Cir. 2006).  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  Bonner v. ISP Techs., Inc., 259 F.3d 924, 929–30 (8th Cir. 2001).

### 2. Shakeshaft's Opinions

Plaintiffs retained Shakeshaft to offer an expert opinion on (1) the foreseeability of educator sexual abuse and misconduct as a well-known hazard and (2) the sufficiency of Shattuck's policies, procedures, and employee handbooks regarding training, prevention, detection, reporting, and investigation of sexual abuse.  Goffe Aff. Exs. 53–55.

Shakeshaft, a Ph.D. in educational administration, has been a professor for the past 36

years.  Aggergaard Decl. Ex. 29 ("Shakeshaft C.V.") at 1.  Currently, Shakeshaft is a professor in

the School of Education at Virginia Commonwealth University.  Id.  She has studied educator

sexual misconduct since the 1980s and has written, spoken, and consulted on that subject

numerous times.  Id. at 2–31; Aggergaard Decl. Ex. 32 ("Shakeshaft Rep.") at 2.

After reviewing documents from these cases, Shakeshaft wrote an expert report for each

of the three cases describing the context of Seibel's abuse of Plaintiffs and stating her opinions.[8]

The "opinions" section of the report addresses four discrete issues (response to allegations,

supervision, policies, and training) and states two ultimate conclusions:  (1) "sexual misconduct

is foreseeable," and (2) "Seibel and other teachers were poorly supervised, complaints were not

investigated, training to prevent educator sexual misconduct was not done, policies were

inadequate, and policies were not followed."  Shakeshaft Rep. at 16–17.  Shakeshaft later

supplemented her report with an addendum collecting cases of sexual abuse in schools and

reiterating the opinions stated in her initial report.[9]  Aggergaard Decl. Ex. 35 ("Shakeshaft

---

[8] The reports are substantially similar except that the report for Doe AB is somewhat longer and more detailed.  Unless otherwise noted, citations and analysis refer to the Doe AB report.  See Aggergaard Decl. Exs. 30–32.

[9] Shattuck argues that the addendum should not be considered for two reasons, neither of which is persuasive.  First, Shattuck argues that the addendum was untimely because it was served one day after expert discovery was to be completed.  Suppressing the addendum as untimely would be both unduly harsh and in tension with Rule 26(e) of the Federal Rules of Civil Procedure, which contemplates supplemental expert disclosures "in a timely manner," but as late as 30 days before trial "if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  Second, Shattuck objects that Shakeshaft did not sign the addendum as required by Rule 26(a)(2)(B).  Assuming that the signature requirement applies to supplemental disclosures made under Rule 26(a)(2)(E), this omission was harmless as the addendum clearly identified Shakeshaft as the author and there is no dispute regarding its authenticity.

Add.").

Shattuck's arguments for excluding Shakeshaft's testimony fall into three general categories.  First, Shattuck argues that Shakeshaft is not qualified to make the opinions stated in her expert report.  Shattuck criticizes Shakeshaft as having "no experience outside academia or as a school administrator."  Def.'s Mem. Supp. Mot. Exclude [Docket No. 62] at 10.  Specific to Shakeshaft's opinions about Shattuck's reporting requirements, Shattuck contends that she lacks the legal training or experience necessary to render an expert opinion.  Id.

A witness may be qualified as an expert based on her knowledge, skill, experience, training, or education.  Fed. R. Civ. P. 702; Moran v. Ford Motor Co., 476 F.2d 289, 291 (8th Cir. 1973).  Shakeshaft's curriculum vitae displays her extensive background in studying educator sexual abuse or misconduct.  It lists at least nine publications, 11 presentations or peer-reviewed papers, and 19 invited talks on the subject.  Furthermore, Shakeshaft states that she has experience related to educator sexual misconduct through her work in assisting schools to respond to allegations against teachers and developing policies and procedures to prevent such misconduct.  Shakeshaft Rep. at 2.  This knowledge and experience qualifies Shakeshaft as an expert in the field of educator sexual abuse or misconduct.  As such, she is qualified to testify as to the existence of mandatory reporting statutes and the policies and procedures that other schools have implemented to comply with such statutes.  However, her testimony may not extend to whether Shattuck or any of its employees actually violated Minnesota's mandatory reporting statute, because that would be an inadmissible legal conclusion.  Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995); Thomas v. Barze, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014).

Second, Shattuck argues that Shakeshaft's opinions lack factual support and are not tailored to each plaintiff's case. "Although the factual basis of an expert's opinion is generally an issue of credibility rather than admissibility, an expert's opinion should be excluded if it is so fundamentally unsupported that it can offer no assistance to the jury." Cole v. Homier Distrib. Co., 599 F.3d 856, 865 (8th Cir. 2010). Shakeshaft bases her opinions on a review of numerous documents related to these cases, including the pleadings, interrogatory responses, depositions, Plaintiffs' school records, Seibel's employment records, and Shattuck's student and employee handbooks.[10] Shakeshaft Rep. at 3–4. Her description of the case is supported by the record, and the minor factual inaccuracies identified by Shattuck go to credibility, rather than admissibility, of her testimony.

Shakeshaft's opinions are also sufficiently directed to each plaintiff's individual case to be admissible. Contrary to Shattuck's argument that her opinions are similar to the "rambling boilerplate recitations designed to meet all law enforcement needs" that the Ninth Circuit rejected in United States v. Weber, 923 F.2d 1338, 1345 (9th Cir. 1990), Shakeshaft's opinions are specific to Shattuck and Seibel's abuse of Doe AB, Doe XY, and Doe YZ. Shakeshaft's opinions do not vary across the three cases, but neither does the common set of facts relating to

---

[10] Shattuck faults Shakeshaft for relying on Doe XY's deposition for her opinions in all three cases and not reading Doe YZ's deposition before writing her report in his case. First, Shakeshaft's reliance on Doe XY's deposition is justifiable because all three cases arise out of similar circumstances and Doe XY was abused around the same time as Doe AB and before Doe YZ. Second, Doe YZ had not yet been deposed when Shakeshaft submitted her report in his case. She instead relied on the pleadings and Rule 26 disclosures for information about his abuse. That does not mean her opinion is fundamentally unsupported, especially considering that the information she had about the earlier abuse of Doe XY and Doe AB is relevant to the foreseeability of Doe YZ's abuse.

foreseeability.  Because Shakeshaft concluded that the earliest abuse (of either Doe AB or Doe

XY) was foreseeable, it follows that the later abuse (of Doe YZ) would also be foreseeable.

Additionally, the distinctions Shattuck seeks to draw between sexual abuse and sexual

misconduct, young children and teenagers, and the standard of care as it existed in approximately

2001 and today are matters for examination at trial, not grounds to exclude the testimony

entirely.

Third, Shattuck argues that Shakeshaft's testimony regarding policies, training, and

mandated reporting of sexual abuse would not assist the jury in understanding the evidence or

determining a fact in issue, as Rule 702 requires.  However, all of those issues are relevant to

whether Plaintiffs' abuse was foreseeable and whether Shattuck breached a duty of care.

Because the average juror is not familiar with how schools handled the risk of sexual abuse of

students at the time it occurred fifteen years ago, Shakeshaft's expertise will aid the jury in

placing the testimony in the perspective of the relevant time period.

## B.  Summary Judgment

### 1.  Legal Standard

Summary judgment is appropriate if there are no genuine issues of material fact and the

moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the

evidence is such that it could lead a reasonable jury to return a verdict for either party.  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A court considering a motion for summary

judgment must view the facts in the light most favorable to the nonmoving party and give that

party the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the nonmoving

party "may not rest upon allegations, but must produce probative evidence sufficient to

demonstrate a genuine issue [of material fact] for trial."  Davenport v. Univ. of Ark. Bd. of Trs.,

553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).

### 2.  General Negligence

Count I asserts a claim of negligence against Shattuck.  This cause of action alleges that

Shattuck was negligent because it had a duty to protect Plaintiffs under an *in loco parentis*

relationship and also because Shattuck had a fiduciary relationship with each Plaintiff.  Shattuck

argues that this claim must be dismissed because Minnesota law does not recognize a claim for

general negligence against a corporation based on acts or omissions related to an employee's

sexual abuse.  Shattuck also argues that Plaintiffs' general negligence claim fails because

Shattuck did not owe Plaintiffs a duty of care under an *in loco parentis* or fiduciary theory.

Plaintiffs disagree both with Shattuck's contention that Minnesota law does not provide an

action for general negligence against Shattuck under the facts presented here, as well as the duty

of care Shattuck owed to each Plaintiff.

Shattuck's initial argument is premised upon M.L. v. Magnuson, 531 N.W.2d 849 (Minn.

Ct. App. 1995), a case involving sexual abuse of a minor by a pastor.  The minor's claims of

negligent hiring, negligent retention, and negligent supervision asserted against the pastor's

employer were submitted to the jury with a single instruction regarding the failure to use

reasonable care.  Id. at 856.  Citing the special characteristics that apply to the "three causes of

action where a claimant sues an employer in negligence for injuries caused by one of its

employees:  negligent hiring, negligent retention, and negligent supervision," the Minnesota

Court of Appeals remanded to the trial court so "more specific instructions that adequately appraise the jury of the particular duty" the pastor's employer owed to the minor could be formed.  Id.  Magnuson stands for the proposition that Minnesota recognizes three "negligent employment theories," and that each theory is sufficiently distinct as to require individualized jury instructions regarding each duty of care a defendant owes to a plaintiff.  Id. at n.3.  Magnuson, however, is not authority that a general negligence claim against an employer for damages caused by acts of an employee is never permitted.  A negligence claim is consistent with Magnuson if liability is asserted on a basis other than the employer-employee relationship even though recovery is sought against the employer for acts of its employees.  Plaintiffs argue that their claims of general negligence may proceed because they are not premised on the employer-employee relationship, but rather are based instead on an *in loco parentis* or fiduciary relationship.

*In loco parentis* refers to "a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation . . . and embodies the two ideas of assuming the parental status and discharging the parental duties." Rohmiller v. Hart, 811 N.W.2d 585, 592 n.7 (Minn. 2012).  At least one court has concluded that a negligence claim based upon an in loco parentis or fiduciary duty is separate and apart from employment-related negligence theories.  See Doe 75 v. Diocese of St. Cloud, No. 73-CV-15-9282 (Stearns Cty. Dist. Ct. May 5, 2016).  In denying the Diocese's motion to dismiss a general negligence claim asserted by a student who was sexually abused by a teacher, the judge in Doe 75 reasoned that the Diocese had a fiduciary relationship with the student that was "differentiated from asserting an employment-related negligence claim against the Diocese based upon the actions of [the

teacher]." <u>Id.</u> at 11.

In this case, Plaintiffs' theory of general negligence liability stems not from the employer-employee relationship between Seibel and Shattuck, but from the parental relationship between Shattuck and Plaintiffs, as students at a boarding school.[11]  A boarding school student has a significantly different lifestyle than a student at a traditional school.  The degree of control and oversight a boarding school has over its students is significantly higher than a traditional school where students return to their homes and parents at the end of the day.  Shattuck assumed legal responsibility for its students' welfare as outlined in its school handbook's policies and procedures.  <u>See generally</u> Goffe Aff. Ex. 2.  The daily needs and concerns that faced Shattuck students, who were most all under 18 years old, were not addressed by the students' parents but were delegated to Shattuck employees such as dorm parents, a role which has not direct comparator in a traditional school.  Because Plaintiffs' in loco parentis-based negligence claim is unique from an employment-based negligence claim, it has a sufficient legal basis to proceed to trial.[12]

Turning to Shattuck's argument that it did not owe Plaintiffs a duty of care under an *in loco parentis* or fiduciary theory, Minnesota law provides that "a defendant owes a duty to protect a plaintiff when action by someone other than the defendant creates a foreseeable risk of

---

[11] Shattuck also has a day program that is not at issue here.

[12] In <u>Doe v. Centennial Independent School District No. 12</u>, the Minnesota Court of Appeals reversed the trial court's grant of summary judgment to the defendant on claims for negligent-retention and general negligence.  No. A04-413, 2004 WL 2939861, at *4 (Minn. Ct. App. Dec. 21, 2004).  This is consistent with reading <u>Magnuson</u> as not expressly foreclosing general negligence claims asserted against an employer for injuries caused by its employee.

harm to the plaintiff and the defendant and plaintiff stand in a special relationship." <u>Domagala v. Rolland</u>, 805 N.W.2d 14, 23 (Minn. 2011).  A special relationship arises where "one person has custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection."  <u>Laska v. Anoka Cty.</u>, 696 N.W.2d 133, 138 (Minn. Ct. App. 2005) (quotation marks omitted).  "Typically, the plaintiff is in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare."  <u>Donaldson v. Young Woman's Christian Ass'n of Duluth</u>, 539 N.W.2d 789, 792 (Minn. 1995).[13]

Setting aside the question of foreseeability, the record provides evidentiary support for a reasonable juror to conclude that Shattuck owed Plaintiffs a legal duty based on their special relationship.  As a boarding school, Shattuck took custody of its students, assuring parents that Shattuck "is legally responsible for their child's welfare."  Goffe Aff. Ex. 2 at 14.  Students lived their adolescent daily lives on the Shattuck campus.  Students were expected to adhere to rules established and enforced by Shattuck that governed conduct ranging from how students could decorate their dorm rooms to bed times.  Shattuck also had authority to discipline students for rule infractions and bad behavior.  In light of Shattuck's control over the welfare of its students, most of whom were under 18 years old, no reasonable juror could conclude that Plaintiffs, as students at a boarding school, were not in a special relationship with Shattuck.

---

[13] Contrary to Shattuck's contention, a corporation may act in loco parentis.  <u>See</u> <u>Vistad v. Bd. of Regents of Univ, of Minn.</u>, No. A04-2161, 2005 WL 1514633, at *2 n.1 (Minn. Ct. App. June 28, 2005) (noting that "modern law provides that a university <u>is not ordinarily</u> in loco parentis with its students" but that a "school district <u>is ordinarily</u> in loco parentis with its minor students" (emphases added)).

### 3.   **Negligent Supervision**

Shattuck argues that Plaintiffs' negligent supervision claims are barred by the statute of limitations.  According to Shattuck, because negligent supervision claims are rooted in respondeat superior rather than direct liability, the statute of limitations of six years is measured from the time each Plaintiff turned 18.  Since all three Plaintiffs were more than 24 years old at the time their respective suits commenced, Shattuck argues that their claims are time barred.  Plaintiffs argue that although liability under respondeat superior and negligent supervision are related, they are legally distinct.  Plaintiffs contend that this distinction matters for statute of limitations purposes because the Child Victim's Act extended the limitations window for sexual abuse claims based on negligence, but not for sex abuse claims based on vicarious liability or respondeat superior.

"Federal courts sitting in diversity apply the forum state's statute of limitations."  Zutz v. Case Corp., 422 F.3d 764, 774 (8th Cir. 2005).  Under Minnesota law, negligence claims are generally subject to a six-year statute of limitations.  D.M.S. v. Barber, 645 N.W.2d 383, 386 (Minn. 2002) (citing Minn. Stat. § 541.05, subd. 1(5)).  Prior to 2013, personal injury claims based on sexual abuse of a minor were subject to a six-year statute of limitations that ran from the time the plaintiff turned 18 years old.  Doe v. Order of St. Benedict, 836 F. Supp. 2d 872, 876 (D. Minn. 2011) (citing D.M.S., 645 N.W.2d at 389).  Under those statutes, the time for Plaintiffs to bring their claims against Shattuck expired when they turned 24 years old.

In 2013, however, the Minnesota Legislature passed the Child Victims Act ("CVA").  2013 Minn. Laws ch. 89, § 1 (codified at Minn. Stat. § 541.073).  The CVA amended the statute of limitations applicable to actions for damages arising from sexual abuse.  Id.  For claims that

were time-barred prior to its enactment, the CVA opened a three-year window during which such

claims may be commenced:

> Notwithstanding any other provision of law, in the case of alleged
> sexual abuse of an individual under the age of 18, if the action would
> otherwise be time-barred under a previous version of Minnesota
> Statutes, section 541.073, or other time limit, an action for damages
> against a person, as defined in Minnesota Statutes, section 541.073,
> subdivision 1, clause (2), may be commenced no later than three
> years following May 25, 2013.  This paragraph does not apply to a
> claim for vicarious liability or respondeat superior, but does apply to
> other claims, including negligence.

Id. subd. 5(b).  Thus, if negligent supervision is a claim for vicarious liability or respondeat

superior, it is barred by the statute of limitations.

Although "[n]egligent supervision derives from the doctrine of respondeat superior," it is

"distinct from the doctrine of respondeat superior" in that negligent supervision takes an

employer's fault into consideration whereas respondeat superior does not.  Magnuson, 531

N.W.2d at 856 n.3, 858.

> Respondeat superior imposes vicarious liability on an employer for
> all acts of its employees that occur within the scope of their
> employment, regardless of the employer's fault.  Negligent
> employment imposes direct liability on the employer only where
> the claimant's injuries are the result of the employer's failure to
> take reasonable precautions to protect the claimant from the
> misconduct of its employees.

Id. at 856 n.3.

Under a vicarious or respondeat superior theory of liability, the fault of the employer is

not considered and the foreseeability determination is limited to whether the employee's acts

were "related to and connected with acts otherwise within the scope of employment."

Fahrendorff v. N. Homes, Inc., 597 N.W.2d 905, 910 (Minn. 1999).  Noting that respondeat

superior liability stems from public policy considerations rather than the employer's fault,

Fahrendorff cautioned against conflating the issue of foreseeability in vicarious liability claims

with the question of foreseeability in a negligence context.  Id. at 912; see also Jones v. James,

No. 02-4131, 2005 WL 459652, at *7 (D. Minn. Feb. 24, 2005) ("Unlike liability based on

respondeat superior, in an action based against an employer based on negligence, liability is

predicated on the fault of the employer.").  In an unpublished decision, the Minnesota Court of

Appeals held that, although derived from respondeat superior, negligent supervision imposes

direct liability upon an employer.  Buckles v. State, No. A08-2098, 2009 WL 2498635, at *4

(Minn. Ct. App. Aug. 18, 2009).  Thus, although rooted in respondeat superior, Plaintiffs' claim

of negligent supervision is sufficiently distinct to remain outside of the ambit of the CVA's

statute of limitations exception.

### 4. Foreseeability

Shattuck argues that it is entitled to summary judgment because Plaintiffs cannot satisfy

the forseeability requirement of their negligence claims.  According to Shattuck, there is no

question of fact about whether Seibel's conduct towards Plaintiffs was objectively reasonable to

be foreseeable.  The Court disagrees.

The elements of Plaintiffs' negligence claims are the existence of a duty of care, breach

of that duty, proximate causation, and injury.  Bjerke v. Johnson, 742 N.W.2d 660, 664 (Minn.

2007).  Subsumed in the duty of care requirement is the need for the harm to be foreseeable.

Doe 175 v. Columbia Heights Sch. Dist., 873 N.W.2d 352, 359 (Minn. Ct. App. 2016).  "In the

context of negligence and negligent supervision claims, foreseeability means 'a level of

probability which would leave a prudent person to take effective precautions.'"[14] Id. (quoting Fahrendorff, 597 N.W.2d at 912).  "In determining whether a danger is foreseeable, courts look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility."  Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A., 582 N.W.2d 916, 918 (Minn. 1998).  "Sexual abuse 'will rarely be deemed foreseeable in the absence of prior similar incidents.'"  Doe 175, 873 N.W.2d at 360 (quoting K.L. v. Riverside Med. Ctr., 524 N.W.2d 300, 302 (Minn. Ct. App. 1994)).

The record includes evidence that sexual abuse of students by teachers was a recognized danger prior to Seibel's abuse of Plaintiffs.  For example, in 1975 Minnesota passed a child protection law that "require[d] the reporting of suspected physical or sexual abuse of children." Aggergaard Decl. Ex. 34 at 33.  Moreover, Shakeshaft avers that "[s]tarting in the mid-1980s onward, sexual abuse of students by adults working in schools was foreseeable."  Id. at 36.  In addition to this general evidence, Scheel, a Shattuck trustee, testified that he was first made aware of teacher-student sexual abuse in 1968 when, as co-director of Shattuck's summer program, Scheel discovered a faculty member in bed with a boy.  Shattuck employees also received specific reports concerning Seibel's inappropriate sexual behavior with students, many of which occurred prior to the abuse of these Plaintiffs.  These reports were made to many prominent Shattuck employees, including the president of the board of trustees, the headmaster,

---

[14] A claim for negligent retention imposes liability "when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness."  Magnuson, 531 N.W.2d at 857 (quoting Yunker v. Honeywell, Inc., 496 N.W.2d 419, 423 (Minn. Ct. App. 1993)).  Although phrased differently, negligent retention still requires that the abuse could be anticipated.  Id. at 858.

and the dean of students.

As discussed above, beginning in the 1996–1997 school year, Shattuck dorm parents received reports that Seibel was encouraging students to dance naked in the shower and to run naked across Shattuck grounds. During the 1999–2000 school year, another dorm parent learned that Seibel was teaching students about penis enlargement techniques. Regarding this evidence, Shattuck contests whether knowledge of the dorm parents can be imputed to Shattuck administration for purposes of foreseeability. Shattuck cites Doe 175, a teacher-student sexual abuse case, in support of the proposition that only knowledge by "school officials" is germane to the question of whether Shattuck had notice concerning Seibel's conduct. But the court in Doe 175 noted that "there is no evidence that any school district employee observed physical contact or sexual conduct of any kind." 873 N.W.2d at 361 (emphasis added). Doe 175 is also relevant because a weight room supervisor reported seeing the abuser alone with a young girl but did not convey this incident to a school official until an internal investigation concerning the abuser had been completed. Id. Despite that, the court still assessed whether seeing the abuser alone with a young girl raised a reasonable inference of potential or ongoing sexual abuse, lending strong support to Plaintiffs' argument that knowledge by a non-managerial employee can be assessed in determining whether future sexual abuse was foreseeable. Id. Importantly, the role and responsibility of a weight room supervisor is markedly different from a dorm parent. A school employee who supervises the weight room is tasked with overseeing one area and is primarily responsible for student safety in the weight room only during the time the facilities are being used. Dorm parents, on the other hand, live in the same building as the students, are vested with residential oversight, and have much greater and more meaningful contact with students. In

34

addition to ensuring students are safe, dorm parents are responsible for a variety of functions such as enforcing dormitory rules, controlling visitor access to the dorm, and providing academic advice.  If a single observation of a weight room supervisor is relevant to foreseeability, then clearly the knowledge of a dorm parent may also be considered.

In addition to the dorm parents, managerial-level employees also received reports of Seibel's misconduct.  Before graduating in Spring 2000, W3 reported to his advisor that Seibel held naked dance parties and patted students' buttocks as they left.  Seibel later testified that Scheel confronted him about these allegations.  Shortly thereafter, in September or October 2000, dorm parent Hedderick reported seeing Seibel watch a group of naked boys dance in the shower area.  When Hedderick later conveyed the incident to the Headmaster, Kieffer responded along the lines of "I thought that had been stopped."  Hedderick Dep. I at 35:2–4.  A juror could interpret Kieffer's response to indicate that Seiblel's history of inappropriate sexual behavior was known to the Shattuck administration.

Further, W3's May 2001 disclosure about the abuse he observed provides additional evidence which if admitted at trial could lead the jury to conclude that Seibel's abuse was foreseeable.[15]  W3 reported that during the AP drama classes, Seibel exposed himself and sexually touched at least three students.  At this point, Kieffer claimed that the "red flags" surrounding Seibel's potential sexual interest in Shattuck students "were flying."  Kieffer Dep. 54:17–21.  Shattuck's delayed investigation of W3's statements—it was not until late September that the three students W3 claimed Seibel touched were interviewed—revealed that Seibel held

---

[15] Because W3's report was made after Seibel abused Doe AB and Doe XY, its import is limited to Doe YZ's claims.

sessions with students to discuss masturbation and penis enlargement techniques, the latter being conduct Seibel admitted to the interim headmaster.

Despite these and other reports concerning Seibel, Shattuck maintains that Seibel's sexual abuse was not objectively foreseeable.  In Doe 175, a case cited heavily by Shattuck for this purpose, the Minnesota Court of Appeals affirmed dismissal of the plaintiff's claims because the abuse was unforeseeable.  In that case, the evidence of the school's knowledge was:  the victim and the abuser talking in the school parking lot; the victim using a computer in the office that the abuser shared with other teachers; a report that the abuser was alone with an unknown young woman in the school weight room; and the victim yelling "I love you" to the abuser at a football practice.  873 N.W.2d at 360–61.  In concluding that these incidents did not make foreseeable an inappropriate sexual relationship between the teacher and student, the Court of Appeals reasoned that none of those events were "sufficiently similar to or indicative of sexual abuse as to give the school district notice that an inappropriate relationship existed."  Id. at 361.

In another case, L.M v. Karlson, 646 N.W.2d 537 (Minn. Ct. App. 2000), a sex abuse case involving a teacher and a day-care student, the Minnesota Court of Appeals affirmed summary judgment for the defendant on the victim's negligent retention claim.  Prior to the abuse being discovered, a co-worker reported that the abuser was "verbally abusive and physically rough with the children," and another co-worker expressed concern to the supervisor that the abuser made "inappropriate comments . . . in front of children."[16]  Id. at 541.  The abuser later testified that nobody ever saw his inappropriate actions and that he purposefully concealed

---

[16] Karlson does not provide any specificity regarding the "inappropriate comments."

his behavior from others.  Id. at 541.  In affirming summary judgment, the Court of Appeals stated that the evidence "failed to show that any of the complaints made about [the abuser] made his sexual abuse of the children foreseeable to [the employer]," supporting the conclusion "that there was no evidence that [the employer] was aware or should have been aware that [the abuser] was sexually abusing children."  Id. at 545.

The events in this case are distinguishable from Doe 175 and Karlson.  In contrast to Karlson, where there was no evidence of a sexual nature that could have alerted the employer to be aware that the abuser was sexually abusing children, Shattuck employees testified that they saw or heard reports of Seibel being present with naked boys and Seibel himself admitted that "everyone knew" about the naked dance parties.  Seibel Dep. at 59:25.  Rather than concealing his behavior, Seibel concealed his intentions, masking the sexual gratification he received from watching the naked students.  Doe 175 is distinguishable because the events cited there were not indicative of potential or ongoing sexual abuse.  The behaviors identified were either "common" or were not "an objectively reasonable indicator of a potentially inappropriate relationship." Doe 175, 873 N.W. 2d at 361.  Comparatively, no reasonable person would find a teacher encouraging and observing high school aged students to dance naked, and discussing masturbation and penis enlargement techniques with students as "common" behaviors.  Seibel's behaviors are objectively reasonable indicators of a potentially inappropriate relationship with students.

Accordingly, it is reasonable to conclude that Seibel's sexual abuse of Plaintiffs Doe AB and Doe XY was foreseeable.  Regarding Doe YZ, who was abused between October 2001 and June 2003, the evidence concerning foreseeability is even stronger.  In addition to the evidence

cited for Doe AB and Doe XY, the jury may also consider W3's May 2001 report that

at least three students were sexually touched by Seibel.  Around this time, Headmaster Kieffer

reported that "the red flags were flying" that Seibel might be sexually attracted to Shattuck

students.  Kieffer Dep. at 54:17–21.  Since a reasonable juror could conclude that the abuse of

Doe AB and Doe XY was foreseeable, it follows that a reasonable juror could conclude that the

abuse of Doe YZ was also foreseeable.

### 5.  Breach

Shattuck also contends that it is entitled to summary judgment because there is no

question of fact concerning whether Shattuck breached any duty in its retention and supervision

of Seibel.

"Recovery for a negligence claim requires not only the existence of a duty of care but

also 'a breach of that duty . . . and . . . that the breach of the duty of care was a proximate cause

of the injury."  Eischen v. Crystal Valley Coop., 835 N.W.2d 629, 637 (Minn. Ct. App. 2013)

(quoting Domagala, 805 N.W.2d at 22 (alterations in original)).  "Breach and causation

questions are ordinarily fact questions."  Id.

### a.  Retention

A successful negligent retention claim arises when an employer "becomes aware or

should have become aware of problems with an employee that indicated his unfitness, and the

employer fails to take further action such as investigating, discharge, or reassignment."

Magnuson, 531 N.W.2d at 857.  If the employer had knowledge that indicated the employee's

unfitness, the question then becomes whether the employer's actions "were reasonable

considering the problem."  J.M. v. Minn. Dist. Council of Assemblies of God, 658 N.W.2d 589,

598 (Minn. Ct. App. 2003).

Regarding Doe AB and Doe XY, who were abused sometime prior to the end of the 2000–2001 school year, a reasonable juror could conclude that after receiving reports of Seibel's unfitness for his job, Shattuck did not appropriately respond.  Prior to the abuse, Shattuck learned that Seibel oversaw naked dance parties in the basement of Whipple.  Despite knowing about these incidents, Shattuck permitted Seibel to continue serving as a Whipple dorm parent until the end of the 2000–2001 school year.  Also during this time, Seibel himself talked to Trustee Scheel about the AP drama classes.  Shattuck's corrective action was merely telling Seibel to stop.  When Hedderick reported to the headmaster that the naked dance parties had not stopped, Shattuck's response was to simply restrict access to Whipple's shower area; Seibel was allowed to continue in his role as a dorm parent living among the students.

A reasonable juror could conclude that Shattuck's response was insufficient given the nature of the allegations.  During these times, Seibel was a dorm parent, living at Whipple with the students.  Rather than removing Seibel from the dorm, curtailing Seibel's access to students, or taking affirmative steps to directly address Seibel's inappropriate sexual behavior with students, Shattuck chose merely to restrict access to the location where the inappropriate behavior was occurring.  If a jury concludes that Shattuck had knowledge of Seibel's sexually inappropriate behavior that made him unfit, that same jury could conclude that Shattuck's modest attempt at corrective action was insufficient.

As to Doe YZ, Shattuck argues that its immediate investigation into W3's report demonstrates the reasonableness of its response.  However, Plaintiffs' expert on this issue disagrees, stating that Shattuck's "investigation does not meet any standards of thoroughness or

professionalism."  Aggergaard Decl. Ex. 32 at 16.  Probative of the reasonableness of Shattuck's investigation is the nearly four-month delay between W3's report in May and the September interviews of the three alleged victims W3 disclosed.  Also relevant is any evidence showing that Shattuck's investigation included interviews of the other Shattuck students that the alleged victims said may have information concerning Seibel.  Additionally, while the investigation was ongoing, Seibel continued to have access to students as either a dorm parent or a study hall proctor.  For those and other reasons, a fact issue remains as to the reasonableness of Shattuck's response after hearing reports of Seibel's misconduct.

### b.  Supervision

"[N]egligent supervision is the failure of the employer to exercise ordinary care in supervising the employment relationship, so as to prevent the foreseeable misconduct of an employee from causing harm to other employees or third persons."  Magnuson, 531 N.W.2d at 858 (quotations omitted).  In considering whether Shattuck breached its duty, the inquiry is "only into the reasonableness of the employer's supervision to prevent" Seibel's sexual abuse.  Olson v. First Church of Nazarene, 661 N.W.2d 254, 265 (Minn. Ct. App. 2003).

Shakeshaft, in her expert report, concludes that Shattuck breached its duty by failing to appropriately supervise Seibel so as to prevent foreseeable misconduct.  She opines that Shattuck, after learning about Seibel's inappropriate encounters with students, should have increased its supervision of Seibel to ensure the objectionable behaviors had ceased, and that Seibel should not have been permitted in a classroom until the investigation into W3's allegations was completed.

Shattuck has not provided evidence to show that it trained its employees about the risks

of sexual abuse at boarding schools or that it taught its faculty how to report instances of

suspected sexual abuse to the proper parties.[17]   The record shows that no Shattuck employee who

learned of Seibel's misconduct knew what to do or whom to speak to about the sexual

misconduct.  Shattuck has not proffered evidence that it increased its supervision of Seibel after

learning about the naked dance parties, Seibel was simply trusted to stop his behavior.  The

evidence submitted does not show that Shattuck responded to the naked dance parties and the

"AP drama" classes by ensuring that other faculty or staff were with Seibel when he was around

children, which as a dorm parent was virtually all of the time.

In P.L. v Aubert, a negligent supervision claim in a teacher-student sex abuse case was

dismissed because other employees made frequent visits to the abuser's classroom, the place

where the sexual abuse occurred.  545 N.W.2d 666, 668 (Minn. 1996).  Despite "all of this

interaction during the school day, the clandestine relationship between teacher and student was

never observed."  Id.  The record here does not include similar evidence.  Quite the opposite; the

"lights-out incident" shows that Seibel was alone when he made his way from room to room at

lights out time.  Moreover, the record also includes numerous reports about Seibel's

---

[17] Prior to the abuse of any Plaintiff, Minnesota had a child protection law that mandated reporting suspicions of sexual abuse to the proper authorities.  There is conflicting evidence of whether Shattuck contacted law enforcement about suspected sexual abuse involving Seibel.  On one hand, Shattuck employees and Dorsey lawyers testified that they attempted to contact the authorities only to learn that "they were not responsible for private schools."  Aggergaard Decl. Ex. 6 at 29:8–18.  On the other hand, Collins of the Faribault Police Department stated that "he did not remember any incidences involving complaints of sexual misconduct at Shattuck St. Mary's . . . nor does he remember anyone from Dorsey Whitney Law Firm in Minneapolis contacting him to report any kind of allegations of sexual misconduct."  Goffe Aff. Ex. 39.  BCA agent Scott Mueller also testified regarding a lack of communication between Shattuck and law enforcement.  See generally id. Ex. 16.

inappropriate behavior.  On this record, there is sufficient evidence for a juror to conclude that

Shattuck breached its duty by failing to reasonably supervise Seibel.

### 6.  Damages

Finally, Shattuck argues that it is entitled to summary judgment because none of the

Plaintiffs have pled or presented evidence of a compensable damages claim.  According to

Shattuck, because Plaintiffs only allege emotional abuse, their claims fail for lack of physical

injury.

"To maintain an action for either negligent retention or negligent supervision, the

existence of a threat or reasonable apprehension of actual physical injury is required."  St.

Hilaire v. Minco Prods., Inc., 288 F. Supp. 2d 999, 1010 (D. Minn. 2003) (emphasis in original);

see also Bruchas v. Preventative Care, Inc., 553 N.W.2d 440, 443 (Minn. Ct. App. 1996).

A genuine issue of material fact exists that precludes summary judgment to Shattuck for

lack of physical injury.  As to Doe XY, the plaintiff who was involved in the "lights-out

incident," it was previously determined that a jury could find Seibel's actions in that incident as

constituting criminal sexual conduct.  Doe XY, No. 15-1154, 2016 WL 3093389, at *7.  The

Minnesota Supreme Court has recognized that sexual abuse and injury are coextensive under

Minnesota's sexual abuse statute in that if an abuser's actions constitute criminal sexual conduct,

then the victim suffered a physical injury.  W.J.L. v. Brugge, 573 N.W.2d 677, 681 (Minn.

1998).

Doe YZ and Doe AB's allegations of physical injury are more straightforward.  Doe YZ

testified that Seibel touched his penis on two separate occasions, and at other times Seibel

instructed him to expose himself and masturbate in Seibel's presence.  Doe AB testified that he

also exposed himself and masturbated in front of Seibel, and that on one occasion Seibel touched

his penis when he was unable to get an erection.  Seibel's conduct alleged by Doe YZ and Doe

AB falls within Minn. Stat. §§ 609.342–609.345, thus constituting sexual abuse and physical

injury.  Id.

## C.  Objection to Order Regarding Punitive Damages

On January 13, 2016, Plaintiffs moved to Amend the Complaint [Docket No. 38] to add a

claim for punitive damages.  On June 13, 2016, Magistrate Judge Steven E. Rau denied the

motion.  See Order [Docket No. 69].  Plaintiffs object to that ruling.

### 1.  Legal Standard

The standard of review applicable to an appeal of a magistrate judge's order on a

nondispositive issue is extremely deferential.  Reko v. Creative Promotions, Inc., 70 F. Supp. 2d

1005, 1007 (D. Minn. 1999).  The district court must affirm an order by a magistrate judge

unless it is "clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a).  "A finding is 'clearly

erroneous' when although there is evidence to support it, the reviewing court on the entire

evidence is left with the definite and firm conviction that a mistake has been committed."

Chakales v. Comm'r of Internal Revenue, 79 F.3d 726, 728 (8th Cir. 1996).  "A decision is

'contrary to the law' when it 'fails to apply or misapplies relevant statutes, case law or rules of

procedure.'"  Knutson v. Blue Cross & Blue Shield of Minn., 254 F.R.D. 553, 556 (D. Minn.

2008) (quoting Transamerica Life Ins. Co. v. Lincoln Nat'l Life Ins. Co., 592 F. Supp. 2d 1087,

1093 (N.D. Iowa 2008)).

### 2.  Plaintiffs' Objections

Plaintiffs offer several reasons why they contend Judge Rau's Order is clearly erroneous

or contrary to law.  First, Plaintiffs argue that Judge Rau applied an incorrect standard of review, one that required meeting a higher burden to amend the Complaint to add punitive damages. Second, Plaintiffs argue that Judge Rau erred in not imputing knowledge of Shattuck employees to Shattuck.  Third, Plaintiffs argue that they should be permitted to seek reconsideration of their motion due to the newly discovered testimony of Scott Ewing, who was a Shattuck student from 1994 to 1999.  Finally, Plaintiffs argue that Judge Rau's Order is clearly erroneous because they each have met their burden to add punitive damages to this case.

### a. Judge Rau Applied the Correct Standard of Review

Plaintiffs argue that Judge Rau applied a more stringent standard of review in deciding whether Shattuck acted with deliberate disregard.  According to Plaintiffs, Judge Rau erred by deciding whether Shattuck acted with deliberate disregard, a question that Plaintiffs argue is properly reserved for the jury.

Judge Rau correctly stated that "[i]n order to establish a claim for punitive damages in Minnesota, a party must show—by clear and convincing evidence—that the Defendant acted with 'deliberate disregard for the rights or safety of others.'"  Healey v. I-Flow, LLC, 853 F. Supp. 2d 868, 875 (D. Minn. 2012) (quoting Minn. Stat. § 549.20, subd. 1(a)).  In making this determination, the evidence must be viewed "through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not." Swanlund v. Shimano Indus. Corp., 459 N.W.2d 151, 154 (Minn. Ct. App. 1990) (emphases in original; quotation marks omitted).

To successfully make a punitive damages claim under Minnesota law, Plaintiffs must

present clear and convincing evidence that Shattuck "show[ed] deliberate disregard for the rights or safety of [Plaintiffs]."  Minn. Stat. § 549.20.  Shattuck acted with deliberate disregard if it

> ha[d] knowledge of facts or intentionally disregard[ed] facts that create[d] a high probability of injury to the rights or safety of [Plaintiffs] and:
>
> (1)  deliberately proceed[ed] to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of [Plaintiffs]; or
>
> (2)  deliberately proceed[ed] to act with indifference to the high probability of injury to the rights or safety of [Plaintiffs].

Id. subd. 1(b).

Here, Judge Rau viewed the evidence as not clearly and convincingly establishing that Shattuck was being deliberately indifferent.  While Plaintiffs appear to argue that Judge Rau is proscribed from making such determinations, he is required to assess whether a reasonable juror could conclude that there is clear and convincing evidence that Shattuck knew of, or intentionally disregarded, facts that created a high probability that Plaintiffs would be harmed. See Ulrich v. City of Crosby, 848 F. Supp. 861, 868–69 (D. Minn. 1994) (noting that the court "must independently ascertain whether there exists prima facie evidence that the defendant acted with a deliberate disregard of the rights or safety of others").  Judge Rau applied the correct analysis.

### b.  Knowledge of Non-Managerial Employees is not Imputed to Shattuck

The second portion of Plaintiffs' Objection argues that Judge Rau erred by not imputing knowledge of non-managerial employees to Shattuck itself.  Plaintiffs argue that knowledge possessed by technology director and advisor Krenzke, teacher and dorm parent Prokopy, and

dorm parent Hedderick, must be imputed to Shattuck because "a corporation is charged with constructive knowledge of all material facts of which its officer or agent acquires knowledge while acting in the course of employment within the scope of his or her authority."Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 896 (Minn. 2006).  However, Minn. Stat. § 549.20, subd. 2(3) provides that punitive damages can only be awarded against a principal for acts done by an agent if "the agent was employed in a managerial capacity with authority to establish policy and make planning level decisions for the principal and was acting in the scope of that employment."  As Judge Rau correctly concluded, Krenzke, Prokopy, and Hedderick are not managerial employees vested with authority to make policy and planning level decisions for Shattuck.  While their knowledge is imputable to Shattuck for negligence purposes, it is not imputable to Shattuck for assessing punitive liability.  See Baufield v. Safelite Glass Corp., 829 F. Supp. 285, 286 (D. Minn. 1993) (citing Minn. Stat. § 549.20 and holding that the statements of an employee without supervisory authority cannot be imputed to the employer for purposes of awarding punitive damages).

The recent testimony of Ewing will not be considered in deciding whether punitive damages are appropriate.  Ewing, a Shattuck student from 1994 to 1999, reported Seibel's inappropriate sexual activities to two dorm parents.  Because neither Ewing nor the two dorm parents were vested with authority to make policy and planning level decisions for Shattuck, their knowledge cannot be imputed to Shattuck for punitive damages purposes.

### c.  Doe AB and Doe XY cannot Plead Punitive Damages

Judge Rau recognized that "[t]his case presents a close call as to whether to permit Plaintiffs to plead a claim for punitive damages."  Order at 16.  For Doe AB and Doe XY, the

Plaintiffs who were abused prior to W3's May 2001 report, Judge Rau's Order is not clearly erroneous or contrary to law.  While later events involving Seibel are easily connected with the benefit of hindsight to the claim of Doe AB and Doe XY, Shattuck cannot be held to such hindsight.  On this record, there is insufficient evidence to conclude that clear and convincing evidence will establish that Shattuck deliberately disregarded the rights and safety of Doe AB and Doe XY.  Doe AB and Doe XY are not permitted to plead a claim for punitive damages.

### d. Doe YZ can Plead Punitive Damages

Doe YZ's argument to be able to argue for punitive damages is a stronger one.  Prior to the abuse of Doe YZ, Shattuck was presented with an abundance of evidence that signaled Seibel had a sexual interest in students.  The headmaster testified as such, stating that the "red flags were flying."  Kieffer Dep. at 54:17–21.  When W3 made his report in May 2001, Minnesota law required the allegations to be disclosed to the proper authorities.  Although the record is unclear about whether law enforcement was actually notified, Shattuck was not diligent in its duty to ensure that objective individuals were engaged to investigate the veracity of W3's claims.  Additionally, the evidence can be viewed as suggesting that the Dorsey investigation was less than comprehensive and objective.  Gilbert, the person to whom W3 made his report, testified that she felt "nailed to the wall" during her meeting with the attorneys, and that many of the questions by the attorneys had a "how dare you element."  Gilbert Dep. at 39:5–7, 40:2–15.  Scheel, who interviewed the three students W3 claimed to have been sexually abused by Seibel, learned that other students may have had additional information about Seibel's sexual behaviors.  The record is silent regarding whether Scheel or anyone else from Shattuck followed up with those individuals.  Moreover, Shattuck's placatory response to the students' answers is

concerning.  The students stated that Seibel's "interest in this kind of stuff was definitely known around the dorm," that Seibel "encouraged the streaks," and that "[e]verybody talked about the fact that [Seibel] liked to look at guys in the shower.  He would pull the shower curtain back and just look."  Scheel Mem.  Indeed, from these interviews Scheel himself concluded that something had happened with Seibel, but he could not get the students involved to talk.  Furthermore, Brown, the interim headmaster who spoke with Seibel about the Dorsey investigation, said that Seibel has a problem and should get help.  Despite Shattuck's knowledge of this information, Seibel was only given a verbal reprimand and was allowed continued access to Shattuck students.  While Seibel's tenure as a dorm parent ended, he continued working at Shattuck as a study hall proctor, and there is no evidence that Seibel's interactions with students were limited or supervised in any way.  On this record, clear and convincing evidence exists that would permit a juror to conclude that Shattuck deliberately disregarded the rights and safety of Doe YZ.  Doe YZ is permitted to plead a claim for punitive damages.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Shattuck-St. Mary's School's Motions for Summary Judgment [No. 15-1151 Docket No. 57] [No. 15-1154 Docket No. 63] [No. 15-1155 Docket No. 53] are **DENIED**;

2. Defendant Shattuck-St. Mary's School's Motions to Exclude Expert Testimony of Charol Shakeshaft [No. 15-1151 Docket No. 58] [No. 15-1154 Docket No. 64] [No. 15-1155 Docket No. 54] are **DENIED**;

3. Plaintiffs' Objections to Magistrate Judge Rau's June 13, 2016 Order denying Plaintiffs' Motions to Amend Their Complaints to Add a Claim for Punitive Damages are **SUSTAINED in part and OVERRULED in part**:

    a.        For Plaintiff Doe AB [No. 15-1155 Docket No. 78] the Objections are **OVERRULED**;

    b.        For Plaintiff Doe XY [No. 15-1154 Docket No. 89] the Objections are **OVERRULED**; and

    c.        For Plaintiff Doe YZ [No. 15-1151 Docket No. 82] the Objections are **SUSTAINED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  October 5, 2016.